IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CYNTHIA MINGO, as personal )
representative of the Estate of Daniel Mingo,)
     Plaintiff, )
  )
v. )   CIVIL ACTION NO. 12-00056-KD-B
  )
CITY OF MOBILE, ALABAMA, )
     Defendant. )

## ORDER

This action is before the Court on the Second Motion for Summary Judgment (Doc. 79) and supporting briefs and exhibits (Docs. 80-83) filed by Defendant City of Mobile, Alabama ("the City") pursuant to Federal Rule of Civil Procedure 56, along with the Response in opposition (Doc. 94) and supporting exhibits (Doc. 93) filed by Plaintiff Cynthia Mingo, as personal representative of the Estate of Daniel Mingo ("Plaintiff"), and the City's Reply (Doc. 95) to said Response.  Upon consideration, and for the reasons set forth herein, the Court finds that the City's second motion for summary judgment is due to be **GRANTED** as to Plaintiff's federal claims and that the remaining state-law claims are due to be **REMANDED**.

### I.    Procedural History

On January 30, 2012, Plaintiff filed a Complaint (Doc. 2-1 at 5-17) in the Circuit Court of Mobile County, Alabama, alleging causes of action against the City for excessive force (Count I), unconstitutional policy and practice (Count II), and failure to train and supervise (Count III) under 42 U.S.C. § 1983, for wrongful death under Ala. Code § 6-5-410 (Count IV), and for negligent and wanton supervision, hiring and retention (Count V).[1]  Said causes of action arise

---

[1] Plaintiff also sued a number of fictitious defendants.  "As a general matter, fictitious-party pleading is not permitted in federal court."  Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) (per curiam).  In any event, Plaintiff has never named any additional defendants, and the time to amend the Complaint

out of an incident occurring on or about January 21, 2010, in which Plaintiff alleges City police officers, upon capturing Daniel Mingo after a pursuit, stripped, dragged, beat, and electrocuted him with a Taser, proximately causing his death on January 28, 2010.  The City was served with the summons and Complaint on January 31, 2012.  (Doc. 1, ¶ 1).

On February 2, 2012, the City commenced this action by filing a Notice of Removal pursuant to and in accordance with 28 U.S.C. §§ 1441 and 1446.  (Docs. 1-2)  The City asserts, correctly, that this Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.  (Doc. 1 at 2, ¶¶ 3-5).  The City then filed its Answer denying liability on February 14, 2012.  (Doc. 5).

On December 10, 2012, the parties filed a Joint Stipulation for Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), dismissing all claims in this action with prejudice.  (Doc. 24).  On January 14, 2013, Plaintiff filed a *pro se* motion to reinstate this action.  (Doc. 25).  On March 26, 2013, the Court, after holding a hearing, ordered the dismissal to be vacated and reinstated this action.  (Doc. 33).

The City's first Motion for Summary Judgment, filed on May 24, 2013, addressed issues regarding the survivability and timeliness of Plaintiff's claims. (Docs. 42-45).  The Court granted that motion only "to the extent Count I of Plaintiff's Complaint alleges a personal injury claim

---

has lapsed (see Scheduling Order, Docs. 12, 39, 41, 51).  See, e.g., Ex parte Hensel Phelps Const. Co., 7 So. 3d 999, 1003 (Ala. 2008) ("[I]t is incumbent upon the plaintiff to exercise due diligence to determine the true identity of defendants both before and after filing the original complaint. It is also incumbent upon the plaintiff to substitute the named defendant for the fictitious party *within a reasonable time* after determining the defendant's true identity, and the same policy considerations which require a plaintiff to amend his complaint within a reasonable time after learning the defendant's true identity also require the plaintiff to proceed in a reasonably diligent manner in determining the true identity of the defendant." (quotations omitted) (emphasis in original)).

rather than a wrongful death claim" and denied it in all other respects.  (Doc. 72).  On October 1, 2013, the City filed the present Motion for Summary Judgment, which was timely pursuant to the Court's scheduling order (see Doc. 71).

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

> **(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4)** ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v.

Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986)).  As the Eleventh Circuit has articulated, however,

> The nature of this responsibility varies . . . depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.
>
> . . . Celotex requires that for issues on which the movant would bear the burden of proof at trial,
>
>> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.
>
> [United States v. ]Four Parcels[ of Real Property], 941 F.2d [1428, ]1438[ (11th Cir. 1991)] (citations and internal quotation marks omitted; emphasis in original).
>
> For issues, however, on which the non-movant would bear the burden of proof at trial,
>
>> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.
>
> Four Parcels, 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).
>
> If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. Coats & Clark, 929 F.2d at 608. If, however,

4

the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. Anderson[ v. Liberty Lobby, Inc.], 477 U.S. [242,] 249-50, 106 S. Ct. [2505,] 2511[ (1986)].

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Celotex, 477 U.S. at 332, 106 S. Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Melissa L. Nelkin, One Step Forward, Two Steps Back: Summary Judgment After Celotex, 40 Hastings L.J. 53, 82-83 (1988).

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (headings and footnotes omitted).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational

trier of fact to find for the nonmoving party."  <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  <u>Celotex</u>, 477 U.S. at 323.  In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor.  <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

**III.    Facts**[2]

On January 21, 2010, Aaron Kelley, a City park police officer ("Officer Kelley"),[3] was driving down Halls Mill Road in Mobile when he observed a yellow and blue car pull out onto the road a private parking lot "at a pretty good rate of speed."  (Kelley Depo., Doc. 81-2 at 7).  Officer Kelley observed the car swerve from one side of the road to the other, to the point that it was almost running off onto the shoulder of the road on both sides.  Officer Kelley activated his police lights, pulled the car over after it had turned onto Bolton Branch Road from Halls Mill Road, and relayed information about the car to a radio operator.  (<u>Id.</u> at 7-10).

---

[2] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the Plaintiff,] the nonmoving party."  <u>Benson v. Tocco, Inc.</u>, 113 F.3d 1203, 1207 (11th Cir. 1997).  Moreover, on summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  <u>See also, e.g.</u>, <u>Sharpe v. Global Sec. Int'l</u>, 766 F. Supp. 2d 1272, 1282 (S.D. Ala. 2011) (Steele, C.J.) ("[T]he Court . . . will not independently examine uncited portions of the record in search of support for a particular proposition[ on summary judgment]." (citing cases)).

[3] At the time of the underlying incident in this action, all police officers involved, <u>see</u> <u>infra</u>, were employed by the City.

As Officer Kelley was pulling the car over, he noticed that the driver appeared to raise his hand as though putting something in his mouth.  As Officer Kelley approached the car on foot, he noticed the passenger, Nadia Lee, throw a coat over her lap, which he believed indicated she was attempting to hide something.  Daniel Mingo ("Mingo") opened the car's driver-side door and Officer Kelley asked him why he was driving recklessly.  Mingo responded that he was on medication and was a patient at Mobile Mental Health.  Officer Kelley then told Mingo to exit his car and step back to Officer Kelley's patrol vehicle.  (Id. at 10-11, 13-14; Kelley Police Statement, Doc. 93-12 at 1-2).[4]

When he first got out of his car, Mingo was holding his billfold in his left hand and had his right hand stuck down between his sweatpants and a second pair of short pants he was wearing.  Officer Kelley told Mingo to remove his hand from his pants and then instructed him a second time to step back to his patrol vehicle.  As Officer Kelley began to perform a pat-down search of Mingo, Mingo ran north on Bolton Branch Road towards Halls Mill Road.  As Mingo ran, Officer Kelley saw something fall out of Mingo's right pants leg.  Mingo continued to run five to ten feet further when he fell face forward on his hands and knees, but he simply rolled over, jumped up, and kept running.  Officer Kelley attempted to deploy his taser, but Mingo was too far away for the prongs to touch him.  (Doc. 81-2 at 14-18; DVD of Dashboard Cam, Doc. 85-1).

Mingo continued to run from Bolton Branch Road over to Carleton Acres Drive East.  As Officer Kelley was coming around a building to get from Bolton Branch Road to Carleton Acres Drive East, he spotted Mingo running.  Mingo was no longer wearing an outer shirt; instead he

---

[4] Nadia Lee told police that Mingo was taking her to work at the time and that they were arguing in the car.  Lee denies that Mingo put anything in his mouth as he was being pulled over.  (Lee Police Statement, Doc. 93-2 at 2, 4).

was wearing only a muscle shirt.  Officer Kelley saw Mingo sit down behind a big bush between 1260 Carleton Acres Drive East and 1262 Carleton Acres Drive East.  Mingo was taking his pants and shoes off at that point.  Mingo then kicked two boards off of a fence at 1260 Carleton Acres Drive East and went through the opening into the backyard.  (Doc. 82-1 at 19-24).

Officer Kelley went through a gate at 1260 Carleton Acres Drive East to the back yard of the house but could not find Mingo.  As Officer Kelley came back around the house he spotted Sgt. Armand Campbell ("Sgt. Campbell") and Officer Henry Bufkin ("Officer Bufkin") pulling up in their vehicle.  Officer Kelley described the direction in which Mingo had run and told them he needed to get back to his car to secure the vehicle and deal with the female passenger.  (Id. at 25-28).

Cynthia Mingo, Mingo's mother, received a call from Nadia Lee informing her that Mingo had been pulled over and had run from the police.  (Cynthia Mingo Depo., Doc. 81-3 at 4-5).  Cynthia Mingo told Lee to let her speak to the police officer there and believes that she spoke to Officer Kelley.  (Doc. 81-3 at 6-7).  Cynthia Mingo testified that she told the officer her son had been very paranoid and would be afraid of the officers and asked them to take him to the hospital if they caught him.  (Doc. 81-3 at 6-7).  The conversation was brief and the officer told her they could not take him immediately to a hospital because they would have to arrest him first.  (Doc. 81-3 at 8).  She states that she then called the 911 operator and told the operator that her son had been stopped in the Navco Road area, that he was a patient at Mobile Mental Health, that he had been very paranoid lately, and that she wanted to make sure nothing happened to him.  (Doc. 81-3 at 9-10).

Officer Kelley walked back to his vehicle on Bolton Branch Road and spotted Officer

Adam Hudson who had arrived to secure his vehicle.  Officer Hudson had picked up the plastic container on the ground where Officer Kelley saw something fall out of Mingo's pants leg, and the two examined its contents.  Officer Hudson stated that the contents looked like ecstasy pills. At this point, Officer Kelley believed Mingo to be under the influence of a controlled substance because his eyes were glossy and due to the pills that appeared to have fallen out from his pants. (Id. at 28-32).

Sgt. Campbell and Officer Bufkin were out taking a break from police headquarters when they heard the call about a suspect running from Officer Kelley near Bolton Branch Road.  They passed by the location of the initial stop on Bolton Branch Road, where other officers were converging, and turned onto the next street over where they found Officer Kelley.   Officer Kelley explained to them that the suspect had gone through a fence at a nearby residence.  After checking with Officer Kelley regarding the situation, Sgt. Campbell and Officer Bufkin parked their vehicle and proceeded to follow the path of the suspect on foot.  They cleared the first back yard where Mingo had broken through a fence, and then followed a footpath into the backyard of the next residence.  At that point, a woman came out of her house to find out what was going on and they instructed her to go back inside and lock her doors.  (Bufkin Depo., Doc. 81-5 at 3-6, pp. 13-16; Campbell Depo., Doc. 81-6 at 3-4, pp. 14-15).

They proceeded to the backyard area of the next residence, where they noticed a flowerpot had been knocked over in front of a garage or shed behind the house.  (Doc. 81-5 at 7). They also noticed some clothing sitting on the ground next to the shed and Officer Bufkin saw what appeared to be a blood smear near the door of the shed. (Doc. 81-5 at 7-8; Doc. 81-6 at 4-5).  Officer Daryl Law ("Officer Law") responded to the area when he heard a call go out about

Officer Kelley pulling over a vehicle.  (Law Depo., Doc. 81-7 at 3-4).  Officer Law was familiar with that area because at the time he was dating a woman who lived on Carleton Acres Drive West.  (Doc. 81-7 at 4 -7).

Officer Law's girlfriend came out of the back door of her house when she saw Officer Law walking up and told him that she heard something in the shed behind her house.  (Doc. 81-7 at 6-8).  Officer Law instructed her to go back in the house and then proceeded toward the shed.  (Doc. 81-7 at 9).  He looked in the shed and realized he needed his flashlight so he returned to his patrol car to retrieve it.  (Doc. 81-7 at 9).  Sgt. Campbell and Officer Bufkin had arrived at the shed when Officer Law returned with his flashlight.  (Doc. 81-7 at 10-11).  The officers stood at the door to the shed, announced that they were police, and ordered whoever was inside to come out.  (Doc. 81-5 at 8).  The officers heard movement but received no response.  (Doc. 81-5 at 8).  After using the flashlight to search inside the shed for two or three minutes, Officer Law spotted Mingo, who was balled up underneath or near a weight bench.  (Doc. 81-5 at 8-9; Doc. 81-7 at 11).  There was also a rack stacked with dumbbells, along with numerous yard tools, hatchets, shovels, and other tools in the shed.  (Doc. 81-5 at 9).

Officer Law instructed Mingo to come out, but Mingo did not respond.  (Doc. 81-5 at 10; Doc. 81-7 at 11).  Officers Law and Bufkin then proceeded to pull him out from under the weight bench.  (Doc. 81-5 at 10-11).  As they were trying to pull him out and place him in custody, Mingo started resisting and fighting with them. (Doc. 81-5 at 10-11; Doc. 81-6 at 6-7).[5]  The officers were able to get Mingo into a prone position, but Mingo would not give them his hands.  (Doc. 81-5 at 11).  The only thing Mingo was wearing at that point was a t-shirt and a sock.

---

[5] Officer Bufkin specifically states that Mingo "went nuts" and that trying to restrain him was like "trying to hold a greased pig[.]"  (Doc. 81-5 at 10-11).

(Doc. 81-6 at 6).

After the officers got one arm behind Mingo's back and a handcuff on it, they attempted to get Mingo's other hand behind his back. (Doc. 81-5 at 11; Doc. 81-6 at 15-16).  Sgt. Campbell kept telling Mingo to give them his other hand but Mingo would push off with it; when they tried to grab it he would drop back down and roll on top of it.  (Doc. 81-6 at 15-16).  During this part of the struggle, Sgt. Campbell struck Mingo four times on the thigh and calf areas, testifying he did so to get Mingo to comply with their instructions.  (Doc. 81-6 at 16).  Shortly after Sgt. Campbell administered those strikes, Mingo complied and gave them his other hand and was then handcuffed behind his back.  (Doc. 81-6 at 16).  The officers were finally able to get Mingo's hands cuffed behind his back in the shed as he continued to kick and roll around. (Doc. 81-5 at 10-13).

Officer Bufkin attempted to place his leg across the back of Mingo's legs to hook them and hold him still, but Mingo continued to kick and struggle.  (Doc. 81-5 at 13-14).  Mingo then started to bang his head on the ground a couple of times, so Officer Bufkin reached over and tried to hold his head still.  (Doc. 81-5 at 15).  Officer Bufkin picked Mingo up by his shoulders and the upper part of his arms and attempted to escort him out of the shed.  (Doc. 81-5 at 16-17).  At that point, Mingo started kicking Officer Bufkin in his shins and knees while lunging forward. (Doc. 81-5 at 17).

At the door of the shed, Mingo broke loose from Officer Bufkin's grip and went headlong out into the yard.  (Doc. 81-5 at 17-18).  Additional officers from Mobile's First Precinct had responded to the scene at this time and started to assist with Mingo.  (Doc. 81-5 at 18-20; Doc. 81-6 at 8-10).  When they tried to continue to escort Mingo by the arm he would either drop to

the ground or stand up trying to run away.  (Doc. 81-6 at 9).  Sgt. Campbell and Officers Bufkin and Law went to find a hose to clean themselves off and make sure they did not have any blood or other bodily fluids on them, while the other officers tried to restrain Mingo. (Doc. 81-5 at 18-19).

Officer Hugh Barnes ("Officer Barnes") was an officer with the City's First Precinct who responded to this incident. (Barnes Depo., Doc. 81-8 at 3).   When he arrived he saw other officers in the backyard; Mingo was on the ground violently flailing back and forth, kicking and rolling around in the dirt. (Doc. 81-8 at 3).  One of the officers was going around moving rakes and other items in the yard.  (Doc. 81-8 at 3).  As Mingo continued to kick and flail around, the officers decided to put Mingo in a four-point restraint.   (Doc. 81-8 at 4).   Once an officer retrieved leg shackles, Mingo was rolled onto his stomach.  (Doc. 81-8 at 4-5).  Officer Barnes was holding Mingo's left shoulder down when Officer Chad Anthony ("Officer Anthony") came in from behind and tried to fold Mingo's legs up to apply the four-point restraint.  (Doc. 81-8 at 4-5).   After they got the leg shackles on one leg, Mingo grabbed one of Officer Anthony's fingers and would not let go. (Doc. 81-5 at 21-22; Doc. 81-6 at 12-13; Doc. 81-8 at 6).

Officer Anthony attempted to strike Mingo's arm with his fist a couple of times to get him to release his hold on his finger but Mingo would not let go. (Doc. 81-5 at 24; Doc. 81-6 at 12-13).  Officer Barnes pulled out his taser and the other officers that he was going to deploy the taser if Mingo did not let go. (Doc. 81-8 at 6).  Officer Barnes applied one drive stun to the small of Mingo's back, just above where he was cuffed, for one five-second cycle. (Doc. 81-5 at 25; Doc. 81-8 at 6-7).  After Officer Barnes applied the taser, Mingo let go of Officer Anthony's finger.  (Doc. 81-8 at 6-7).  The officers then completed placement of the leg shackles and put

Mingo in the four-point restraint. (Doc. 81-8 at 7).  At that point, Officers Barnes, Anthony, and Zach Davis ("Officer Davis") picked Mingo up and carried him out to Officer Anthony's patrol car.  (Doc. 81-8 at 7-8; Davis Police Statement, Doc. 93-4 at 4).

Lt. Travis Dannelley ("Lt. Dannelley") originally responded to the location where Officer Aaron Kelley first stopped Mingo on Bolton Branch Road. (Dannelley Depo., Doc. 81-9 at 3-8). Officer Kelley had returned to that scene from his pursuit of Mingo and he informed Lt. Dannelley about Mingo running and shedding his clothes. (Doc. 81-9 at 9).  While Officer Kelley was telling Lt. Dannelley about the initial stop, they heard over the radio that the other officers had Mingo in custody.  (Doc. 81-9 at 9).  Lt. Dannelley then proceeded to the location on Carleton Acres Drive West where Mingo was in custody.  (Doc. 81-9 at 9).  When he arrived Mingo was in the backseat of a patrol car laying on his side in a four-point restraint (also called a "hog tie").  (Doc. 81-9 at 10).  Lt. Dannelley tried to speak with Mingo but Mingo was unresponsive to his questions. (Doc. 81-9 at 11-12).  Mingo's stare was fixed, he kept licking his lips, the outside of his mouth turned white, and his tongue would hang out.  (Doc. 81-9 at 11). Mingo continued to flex against the restraints.  (Doc. 81-9 at 12).  Lt. Dannelley instructed Officers Davis and Anthony to stand beside the car and monitor Mingo to make sure he stayed on his side.  (Doc. 81-9 at 12-13).  Lt. Dannelley was advised that an ambulance had already been called at that time. (Doc. 81-9 at 14).

Mingo was initially placed in the backseat of the patrol car on his side facing towards the rear of the car.  (Doc. 81-6 at 18-20; Davis Depo., Doc. 81-10 at 3).  The officers then flipped him over so that he was on his side facing the partition between the front seat and the back seat. (Doc. 81-6 at 20-21; Doc. 81-10 at 3).  Mingo continued to move and wiggle around in the back

seat and was moaning and making noises.  (Doc. 81-10 at 6; Doc. 93-4 at 2).  The paramedics

had been called after Mingo was tased and the four-point restraints were fully applied.  (Doc. 81-

10 at 7).  Officer Davis was positioned on the driver's side back door monitoring Mingo the

entire time he was in the back of the patrol car.  (Doc. 81-10 at 8-9).

Mingo continued to move around in the back seat and would roll over onto his stomach

from time to time, though Officer Davis would then push him back onto his side, such that

Mingo would only be on his stomach for a matter of seconds.  (Doc. 81-10 at 14-15).  When

Mingo would fall on his stomach, he would lick the car seat, and he continued to scream and

shake the car.  (Doc. 93-4 at 4-5).  Mingo was in the back of the patrol car approximately ten to

fifteen minutes before the paramedics arrived. (Doc. 81-10 at 8-9; Doc. 93-4 at 4).  To Officer

Davis, Mingo appeared to lose consciousness just as the ambulance was arriving on the scene.

(Doc. 81-10 at 10; Doc. 93-4 at 2).  Lt. Dannelley had walked over to the ambulance personnel

when Officer Davis and other officers yelled for both him and the ambulance personnel to come

over to check on Mingo.  (Doc. 81-9 at 15-17; Doc. 81-10 at 11).  Mingo was then pulled out of

the car and placed face down so that the leg shackles and handcuffs could be removed. (Doc. 81-

9 at 17; Mitchell Depo., Doc. 81-11 at 7, pp. 22-25).  He was then placed on and secured to a

gurney, and the paramedics took him to the ambulance and transported him to Infirmary West

Hospital. (Doc. 81-9 at 17; Doc. 81-11 at 7-8, pp. 24-25; Doc. 93-4 at 2).  The decision was

made to remove life support, and Mingo died on January 28, 2010.  (Doc. 81-3 at 12).

## IV.    Analysis

### a.      § 1983 Claims

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

Plaintiff asserts claims only against the City in this action, advancing no claims against any individual.  "Although the Supreme Court has held that . . . local government entities[] are 'persons' within the scope of § 1983, and subject to liability, [Plaintiff] cannot rely upon the theory of *respondeat superior* to hold the C[ity] liable."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  Rather,

[a] municipality may only be held liable under § 1983 when one of its policies causes a constitutional injury. Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A court's first inquiry in assessing municipal liability is whether there is a direct causal link between a municipal policy and the alleged constitutional injury. City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). "It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation." Cuesta v. Sch. Bd. of Miami–Dade Co., 285 F.3d 962, 967 (11th Cir. 2002). The policy must be the "moving force" behind the constitutional injury. Id. (quoting Gilmere v. City of Atlanta, 737 F.2d 894, 901 (11th Cir. 1984)). When a municipal policy itself violates federal law, or directs a municipality to do so, resolving "issues of fault and causation is straightforward." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997). But when that is not the case, determining causation is more difficult. Id. at 406, 117 S. Ct. 1382. If a facially-lawful municipal action is alleged to have caused a municipal employee to violate a plaintiff's constitutional rights, the plaintiff must establish "that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Id. at 407, 117 S. Ct. 1382 (quoting City of Canton, 489 U.S. at 388, 109 S. Ct. 1197).

Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, FL, 637 F.3d 1178, 1187 (11th Cir. 2011).  " 'A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.... A custom is a practice that is so settled and permanent that it takes on the force of law.' "

Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)).

The City asserts that it is due summary judgment on Plaintiff's § 1983 claims because, Plaintiff "is unable to establish that any policy or custom of the City was the moving force behind any alleged constitutional violation.  Moreover, in addition to the fact that the Plaintiff has failed to identify any unconstitutional policy of the City of Mobile, there has been no showing that the Plaintiff's claims can be tied to any policy attributable to a final policy maker for the City of Mobile."  (Doc. 80 at 23-24).[6]  In response, Plaintiff argues that her § 1983 claims are based on the City's policy- or custom-based failure to train its police officers in arresting and restraining the mentally ill or disturbed.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

---

[6]      The City appears not to argue in its motion for summary judgment the issue of whether the officers' conduct actually resulted in a constitutional injury.  (See Doc. 80 ("The Plaintiff fails to state a viable §1983 claim against the City of Mobile in this case since she is unable to establish that any policy or custom of the City was the moving force behind any alleged constitutional violation. Although the City asserts that the officers acted lawfully under the circumstances, even if they did not, the City of Mobile would have no liability in this case.")).  Accordingly, that issue will not be considered in ruling on the City's motion.  See Fitzpatrick, 2 F.3d at 1115 (On summary judgment, "[t]he movant's initial burden consists of a 'responsibility [to] inform [ ] the ... court of the basis for its motion and [to] identify[ ] those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.' " (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

While the City appears to argue the issue in its Reply (see Doc. 95 at 7-8, 10-11), arguments raised for the first time in a reply are not to be considered.  See, e.g., Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." (quotation omitted)); Carter v. Univ. of S. Ala. Children's & Women's Hosp., 510 F. Supp. 2d 596, 608 (S.D. Ala. 2007) (Steele, J.) ("The Court declines to consider new grounds for summary judgment raised for the first time in a reply brief. Such issues are not properly before it where, as here, they could and should have been presented previously and the movant has offered no explanation for the delay.").

government policy for purposes of § 1983."[7]   Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id. (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")).

The Eleventh Circuit has articulated the standard for such a claim as follows:

A municipality can . . . be held liable under § 1983 when its employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). But "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388, 109 S. Ct. 1197. To establish a municipality's "deliberate indifference," a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area. Gold, 151 F.3d at 1350–51.

Am. Fed'n of Labor, 637 F.3d at 1188-89.

As to its alleged failure to train its officers, the City asserts that "there is no evidence to support a claim in this case that insufficient police training was the cause of any alleged constitutional violation brought pursuant to § 1983, and there is no evidence to suggest notice on the part of the City of Mobile that additional training was needed in any specific area relevant to the facts of this case."  (Id. at 24).  The City elaborates as follows:

. . . Plaintiff has not established any facts to support any notice to the City sufficient to support a § 1983 failure to train claim under either method.  There is

---

[7] As such, Plaintiff's claims in Count I ("Excessive Force") Count II ("Unconstitutional Policy and Practice of the City of Mobile") and Count III ("The City of Mobile's Failure to Train and Supervise") of her Complaint can be read as comprising a single § 1983 claim against the City – the alleged "failure to train and supervise" is the City's alleged "unconstitutional policy and practice" that resulted in the alleged use of unconstitutional "excessive force" by the City's police officers against Mingo.

no evidence of any pattern of similar occurrences involving City of Mobile police officers sufficiently similar to the facts outlined in this case to make the City aware of any pattern of constitutional violations requiring additional training. There can also be no liability under a failure to train claim where, as here, the officers acted in accordance with their policies and training. The only criticism by plaintiff's police "expert" is that the officers should have made a different judgment call on the scene despite the fact that he agrees that the policies were themselves sufficient and constitutional. Since the actions of the officers were within their discretion and in accordance with their policies, Plaintiff cannot support any failure to train theory . . .

(Id. at 27).

Though Plaintiff's Response (Doc. 94) is by no means a model of clarity, she appears to assert that Mingo's death was the result of the City's policy- or custom-based failure to properly train its officers in the use of "hog-tie" restraints, especially with regards to persons such as Mingo who are experiencing mental illness or disturbance.  (See Doc. 94 at 20-22 ("The conduct at issue involves hogtying . . . Plaintiff first argues that fettering Mingo in a hogtie was excessive force because hogtying a person with diminished capacity poses a high potential of death or bodily injury. . . The policies are evidence of the knowledge of the City of Mobile that hogtying is a dangerous practice and that hogtying poses a high potential for death or serious bodily injury to the mentally infirm.")).  Plaintiff specifically points to two Mobile Police Department memoranda – General Order #70 ("GO 70"), which addresses "Prisoner Transportation" and is dated "03/06/08" [8] (Doc. 93-6), and Memorandum Order 2005-88 ("MO-2005-88), which addresses "Recognizing and Handling Persons with Mental Illness" and is dated "November 17, 2005" (Doc. 93-7).  Plaintiff then cites to the testimony of Deputy Chief James Barber of the Mobile Police Department, who testified at deposition that "[t]here's no requirement of testing on the memorandum orders" and "general orders" such as GO 70 and MO-2005-88, nor are

---

[8] Plaintiff in particular focuses on Sections 70.2.1 ("Prisoner Restraint Requirements") and 70.3.1 ("Sick, Injured, and Disabled Prisoners") of GO 70 (Doc. 93-6 at 4-5).

officers trained in conjunction with such orders; rather, such orders are simply subject to "read and sign dissemination" to officers, with an "officer attest[ing] that he has read the order either by signing a piece of paper or making an indication on a computer."  (Doc. 93-8 at 17-18, pp. 165-66, 179).

The Court rejects Plaintiff's implication that any failure to provide specific training or testing in conjunction with GO 70 and MO-2005-88 amounts to no training at all regarding the use of restrains on mentally ill or disturbed persons.  In the first place, these detailed orders, which officers are expected to read and must acknowledge having done, can be considered a form of training in themselves.  Moreover, Deputy Chief Barber testified that officers are provided "basic academy training on dealing with emotionally disturbed people or mental illness[,]" though he was "not sure if [the training] covers" MO-2005-88 and other general orders.  (Id., pp. 166, 179).  The City has also submitted an affidavit by Deputy Chief Barber that further details the training the City provides its police officers.  (Doc. 81-18).  Of particular relevancy, Deputy Chief Barber avers: "The Mobile Police Department maintains its own police academy to provide minimum standards training to prospective police officers, as well as additional training to officers already on the force . . . The minimum standards training provided at the Mobile Police Academy and other accredited law enforcement academies in Alabama cover many different areas of law enforcement.  Included within this training is specific training with regard to the use of force and restraints.  This minimum standards training also includes training regarding handling mentally ill and emotionally disturbed persons . . ."  (Id. at 2-4, ¶¶ 3, 5).

Plaintiff attempts to demonstrate inadequacy of training merely by pointing to various

claimed failures of the officers involved in Mingo's arrest and restraint to adhere to G0 70 and

MO-2005-88.  However, "[i]n resolving the issue of the City's liability, 'the focus must be on the

adequacy of the training programs in relation to the tasks the particular officers must perform,'

and not merely on the training deficiencies for a particular officer.  It is thus irrelevant what

training each specific officer present at the scene was given or retained."  Lewis v. City of W.

Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting City of Canton, 489 U.S. at

390) (internal citation omitted).  Plaintiff offers only conclusory assertions to support her

argument that the above-stated training programs themselves are inadequate, which cannot

establish a genuine issue of material fact in this regard.

Moreover, "to hold a municipality liable for failure to train it is not enough to show that

the training was inadequate.  The city must be on notice that the training was inadequate as

well."  Am. Fed'n of Labor, 637 F.3d at 1189 (internal citation omitted).  See also Gold, 151 F.3d

at 1351 ("[W]ithout notice of a need to train or supervise in a particular area, a municipality is

not liable as a matter of law for any failure to train and supervise.").

> Establishing notice of a need to train or supervise is difficult. A plaintiff may
> demonstrate notice by showing a "widespread pattern of prior abuse" or even a
> single earlier constitutional violation. Gold, 151 F.3d at 1351. But a plaintiff must
> also demonstrate that constitutional violations were likely to recur without
> training. Id. at 1352 n.12. In some cases, the need for training is so obvious that
> deliberate indifference can be established even without an earlier violation or
> pattern of abuse. Brown, 520 U.S. at 409, 117 S. Ct. 1382. Still, it must have been
> obvious that the municipality's failure to train or supervise its employees would
> result in a constitutional violation. Id. In addition to notice, a plaintiff must also
> establish that the city "made a deliberate choice" not to train its employees. Gold,
> 151 F.3d at 1350.

Id.

"[A]ny such 'obvious need' claim must be based on a 'particular glaring omission in a

training regimen' and not merely on 'possible imperfections' in a training program." West v. Tillman, 496 F.3d 1321, 1332 n.16 (11th Cir. 2007) (per curiam) (quoting Gold, 151 F.3d at 1352 (quotation marks and citations omitted)).   Plaintiff argues that the need for additional training on GO 70 and MO-2005-88 was obvious because Deputy Chief Barber "obviously knew of the unusually high risk of death or injury from hogtying mental patients that his officers would come into contact with and he said so in his deposition."  (Doc. 94 at 24).  The failure to provide additional training on these two orders, Plaintiff argues, "is not a mere 'imperfection' but, it is a 'glaring omission,' and shows deliberate indifference of the part of Mobile."  (Id. at 25.  See also id. at 26 ("Deputy Barber knew of the risks in hogtying mental patients and had knowledge that there was no training on MO-2005-88. That was not a question of imperfect training, but a deliberate indifference.")).

The Eleventh Circuit has rejected contentions that the use of various restraints, including hog-ties, constitute situations where "the likelihood for constitutional violation is so high that the need for training would be [so] obvious" as to relieve Plaintiff of the burden to present evidence of prior instances of misconduct.  Lewis, 561 F.3d at 1293.

In Lewis, the court was presented facts similar to those presented in this action:

On October 19, 2005, Officer Raymond Shaw encountered Donald George Lewis near the intersection of 45th Street and Broadway in West Palm Beach, Florida. Lewis was disoriented, stumbling into the road, and trying to flag down passing vehicles. Officer Shaw attempted to stop Lewis, who was breathing heavily, grunting incoherently, and appeared to be under the influence of some type of narcotic. Shaw instructed Lewis to sit down on the side of the road. Lewis complied, but seconds later he stood and ran into traffic. Shaw struggled with Lewis and maneuvered him to the ground. He then attempted to handcuff Lewis's hands behind his back. Officer Robert Root appeared on the scene. In an effort to assist Shaw in the handcuffing process, Officer Root placed his knee on Lewis's upper back and neck. Officer Thelton Luke also arrived on the scene. Officers Luke and Root then bound Lewis's legs using a leg restraint. Throughout, Lewis

continued groaning and breathing heavily and did not respond to Shaw's repeated requests to calm down. The three officers carried Lewis to the side of the road. They attempted to place him in a seated position, but Lewis would not sit up. Officers Randall Maale and Audrey Dunn arrived. Officer Maale suggested Root further restrain Lewis by attaching the ankle restraint to the handcuffs with a hobble cord (also known as "TARP," the total appendage restraint position). In an attempt to attach the hobble, Luke and Root kept their knees on Lewis's back, while Shaw picked up Lewis's bound legs and pushed them forward. The hobble was tightened so that Lewis's hands and feet were close together behind his back in a "hogtied" position. After Lewis's hands and feet were bound together, Maale realized that Lewis had become unconscious. The officers removed the hobble and restraints and began CPR. Paramedics arrived within minutes, but were unable to resuscitate Lewis. He was later pronounced dead.

Id. at 1290 (footnotes omitted).

The plaintiff in Lewis asserted "that the pressure applied to Lewis's upper back and neck by Officer Luke and then Officer Shaw, along with the use of the hobble as a hogtie caused Lewis's sudden death, and that these actions can be attributed to City policy against the City of West Palm Beach," and argued "that the need for training on the proper use of hobble restraints and the proper placement of weight on an arrestee's back during the restraint process is 'so obvious' that it requires proactive training by the City to ensure avoidance of constitutional violations." Id. at 1293. Affirming the grant of summary judgment in favor of the city, the court addressed that argument as follows:

In establishing this form of notice, the Supreme Court referenced the proper use of firearms and the correct use of deadly force as an area that would be so obvious as to require adequate training by the municipality to avoid liability. City of Canton, 489 U.S. at 390 n.10, 109 S. Ct. 1197. In comparison, this Court refused to acknowledge the proper response to handcuff complaints as so obvious as to put the municipality on notice that training is required. Gold, 151 F.3d at 1352. Similarly, the application of a hobble does not rise to the level of obviousness reserved for "a narrow range of circumstances [where] a violation of federal rights may be a highly predictable consequence" of a failure to provide adequate training. Bd. of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Despite the questionable use of the hobble in this particular situation, hobbles do not have the same potential

22

> flagrant risk of constitutional violations as the use of deadly firearms. Failure to provide training on hobbles is not a "particular glaring omission in a training regimen." Id. at 410, 117 S. Ct. 1382. Notably, in both the case at bar and as previously decided in Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir.2004), hogtying or "fettering" under the given circumstances does not violate the Fourth Amendment. The City is therefore unlikely to be on notice of its potential legal ramifications in this context. Thus, the hobble, and the understanding of its proper application, does not carry a high probability for constitutional violations in the manner intended by the "so obvious" notice that would open the door to municipal liability.

Id.[9]

The Eleventh Circuit has similarly refused to find obvious the need for training regarding the mentally ill.  See Young v. City of Augusta, Ga. through DeVaney, 59 F.3d 1160, 1171-72 (11th Cir. 1995) ("Young attributes her alleged damages to a City custom of inadequate selection and training of employees when it comes to inmates suffering from mental illness and of failing to provide on-site medical care at the jail . . . [T]he need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations. See, e.g., [City of Canton, Ohio, 489 U.S.]  at 390 n.10, 109 S. Ct. at 1205 n.10, 103 L. Ed. 2d at 427 n.10 (citing the obvious need to train officers with respect to the constitutional limitations on the use of deadly force). Young's claims do not fit within this category. See id. at 396–97, 109 S. Ct. at

---

[9] The Supreme Court appears to have recently affirmed that City of Canton did indeed establish a range of circumstances under which a need for training is obvious also that this range is very narrow.  See Connick, 131 S. Ct. at 1361 ("In Canton, the Court left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." (internal citations and quotation marks omitted)).

1209, 103 L. Ed. 2d at 432 (observing that contentions "that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city") (O'Connor, J., concurring in part and dissenting in part)."); Borton v. City of Dothan, 734 F. Supp. 2d 1237, 1256 (M.D. Ala. 2010) (Watkins, J.) ("The Eleventh Circuit has repeatedly rejected attempts to extend failure-to-train liability to other law-enforcement situations, such as . . . the identification and treatment of mentally ill inmates by jail staff, see Young v. City of Augusta, Ga., 59 F.3d 1160, 1171–72 (11th Cir. 1995); O'Gwynn v. City of Foley, CIV.A. 00-0273-CB-S, 2002 WL 32993824 (S.D. Ala. Sept. 20, 2002) (Butler, C.J.) ("[P]laintiff argues that the need to train [police officers to deal with the mentally ill] was obvious so that no other notice was necessary. This argument is foreclosed by Young, a case involving claims nearly identical to O'Gwynn's claims in this case. Id. Young claimed that even without evidence of prior violations the defendant municipality was on notice of the obvious need to train '[jail employees] to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed.' Id. Citing Justice O'Connor's concurring opinion in Canton, the Eleventh summarily rejected plaintiff's contention. Id.; see also, City of Canton, 489 U.S. at 396–97 (O'Connor, J. concurring in part and dissenting in part) (no obvious need for training giving rise to deliberate indifference where plaintiff asserted that police officers were inadequately trained in diagnosing symptoms of emotional illness)."). [10]

---

[10] To the extent Plaintiff relies on the testimony of her expert witnesses to demonstrate that the need for training was obvious, the Court notes that "an expert's conclusory testimony does not control th[e] Court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need." Gold, 151 F.3d at 1352 n.13.

Moreover, the undisputed evidence indicates that City police officers receive at least some training on the use of restraints and interacting with the mentally ill.  Cf. Lewis, 561 F.3d at 1293-94 ("Additionally, the City of West Palm Beach does provide training on the use of the hobble . . . While not under a specific constitutional duty under § 1983, the City takes actions to ensure that arrestees are not subjected to unnecessary or painful procedures when restrained. []Because the City of West Palm Beach did not maintain a deliberate indifference to a potentially obvious constitutional violation and because the City provides some training on the use of hobbles, the City cannot be held liable under 42 U.S.C. § 1983.").

Based on the reasoning in Lewis and Young, the Court finds as a matter of law that the City did not maintain a deliberate indifference to a potentially obvious constitutional violation. [11]

Accordingly, Plaintiff must demonstrate notice to the City "by showing a widespread pattern of prior abuse or even a single earlier constitutional violation" resulting from the City's alleged failure to adequately train its officers either in restraining and/or dealing with the mentally ill.  Am. Fed'n of Labor, 637 F.3d at 1189 (quotation marks omitted).  Plaintiff, however, has not pointed to evidence of "even a single earlier constitutional violation" resulting from such alleged failure to adequately train.  Cf. Gold, 151 F.3d at 1351 (". . . Gold presented

---

[11] In support of her argument that the City was on notice of the dangers of hog-tying, Plaintiff has cited Cruz v. City of Laramie, Wyo., 239 F.3d 1183 (10th Cir. 2001), which affirmed the denial of summary judgment to a municipality as to the plaintiff's § 1983 claim for failure to train police on the use of hobble restraints.  (Doc. 94 at 20).  In doing so, however, the Tenth Circuit pointed out that "[t]he district court found that genuine issues of material fact were in dispute" by, inter alia, "cit[ing] evidence that the City failed to train its officers on the use of hobble restraints and that the City put such restraints in its police cars."  Id. at 1191.  In this case, undisputed evidence has been presented that City officers are given some training on the use of restraints.  In any event, Cruz appears to base its holding on a finding that the need for training in the use of hobble restraints was obvious; Lewis has foreclosed such a determination in this Circuit.

no evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing. Gold presented only evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing, without any showing of excessive force involved.").  Thus, even assuming constitutionally inadequate training in the use of restraints or dealing with the mentally ill or disturbed, Plaintiff has presented no evidence demonstrating a genuine issue of material fact as to whether the City was on notice of this inadequacy.

Having determined that Plaintiff, "the nonmoving party[, has] fail[ed] to make a sufficient showing to demonstrate an element essential to [her § 1983 claims], on which [she] bears the burden of proof at trial," the Court finds that "no genuine of issue material fact exists" and that the City "is entitled to judgment as a matter of law under that version of the facts." McDowell, 392 F.3d at 1288-89.  Accordingly, the Court finds that the City's second motion for summary judgment is due to be granted as to Plaintiff's § 1983 claims, as set out in Counts I, II, and III of Plaintiff's Complaint (Doc. 2-1 at 5-17).

**b.**  **State Law Claims**

Plaintiff alleges claims against the City arising under state law in Counts IV and V of her Complaint.  The City did not set forth a basis for original jurisdiction over the state law claims in its Notice of Removal (Doc. 1), and no such basis is apparent from the record.[12]  Rather, the

---

[12] The Court doubts that the City can establish diversity jurisdiction pursuant to 28 U.S.C. § 1332, even if given the opportunity.  "[A] political subdivision of a State, unless it is simply the arm or alter ego of the State, is a citizen of the State for diversity purposes."  Moor v. Alameda Cnty., 411 U.S. 693, 717 (1973) (quotation marks and footnote omitted).  Even if the City is a "citizen" for diversity purposes, Plaintiff's Complaint alleges that, at the time of filing, she was "[wa]s a resident of Mobile County, Alabama . . ." (Doc. 2-1 at 8).  See, e.g., Audi Performance & Racing, LLC v. Kasberger, 273 F. Supp. 2d 1220, 1225 (M.D. Ala. 2003) ("When a court is reviewing the citizenship of the parties to determine if the suit meets the requirements of diversity jurisdiction, the court must look to the citizenship of the parties **at the time**

Court has exercised supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  However, the Court has granted summary judgment against Plaintiff on all of her claims over which the Court had original jurisdiction, the Court declines to continue exercising supplemental jurisdiction over Plaintiff's state law claims.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . ."); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam) ("We have encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, Gibbs strongly encourages or even requires dismissal of state claims.' " (quoting L.A. Draper & Son v. Wheelabrator–Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)))); Dockens v. Dekalb Cnty. Sch. Sys., 441 F. App'x 704, 709 (11th Cir. 2011) (per curiam) ("Once the district court properly granted summary judgment for the School System on the FMLA claims, no federal claims remained.  It was not abuse of discretion for the court to decline supplemental jurisdiction over the state law claim.").

Accordingly, Plaintiff's state law claims, as set out in Counts IV and V of the Complaint, are due to be **REMANDED** to state court.  See, e.g., Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1226 (11th Cir. 2010) (". . . [F]ederal district courts in removal cases must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction . . .").

---

**the action was filed** and at the time of removal." (emphasis added)).

**V.      Conclusion**

In accordance with the foregoing analysis, it is **ORDERED** that the City's Second Motion for Summary Judgment (Doc. 79) is **GRANTED** as to all of Plaintiff's federal claims brought under 42 U.S.C. § 1983 (Counts I, II, and III), which are **DISMISSED with prejudice**. It is further **ORDERED** that Plaintiff's state law claims (Counts IV and V) are **REMANDED** to the Circuit Court of Mobile County, Alabama, in accordance with 28 U.S.C. § 1447(c).

Final Judgment in accordance with this Order shall be entered by separate document.

**DONE** and **ORDERED** this the **19**th day of **November 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**