[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15828
_____

D.C. Docket No. 1:12-cv-12-00056-KD-B

CYNTHIA MINGO,
as personal representative of the estate of Daniel Mingo,

Plaintiff-Appellant,

versus

CITY OF MOBILE, ALABAMA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(November 18, 2014)

Before ED CARNES, Chief Judge, and JORDAN and ROSENBAUM, Circuit
Judges.

PER CURIAM:

The claims in this case arise from the restraint of Daniel Mingo following a traffic stop, during which Mingo fled the scene. After a prolonged chase and struggle with Mingo, police officers used a four-point restraint to control Mingo and then placed Mingo in the back of a patrol car. Mingo suffered a cardiac arrhythmia and later died.

Following Mingo's death, Mingo's mother, Cynthia Mingo, brought claims pursuant to 42 U.S.C. § 1983 against the City of Mobile. The district court determined that the City was entitled to summary judgment on the § 1983 claims because Ms. Mingo offered no evidence of any policy or custom by the City that caused Mingo's death. On appeal, Ms. Mingo contends that the district court erred when it granted summary judgment in favor of the City because, she asserts, an issue of fact exists with respect to whether the City failed to train its officers in identifying and dealing with the mentally ill and in the appropriate use of the four-point restraint. Although Mingo's death was tragic, we find no error in the district court's order granting summary judgment for the City.

## I.

### A.

On January 21, 2010, Officer Aaron Kelley observed a car swerving from one side of the road to the other. The car was driven by Daniel Mingo, and his

girlfriend, Nadia Lee, was a passenger.  Upon observing Mingo's erratic driving, Officer Kelley activated his blue lights and pulled the vehicle over.  When Officer Kelley reached the driver's side door, he asked why Mingo was driving recklessly, and Mingo responded that he was on medication and was a patient at Mobile Mental Health.

Officer Kelley instructed Mingo to get out of his vehicle and walk back to the patrol car.  When Mingo first exited his car, one of his hands was stuck between his sweatpants and a second pair of shorts.  Because of this behavior, Officer Kelley began a pat down to determine whether Mingo had any weapons, but Mingo began to flee, running into a residential neighborhood.

Mingo ran until he fell face down onto his hands and knees, but the fall stopped Mingo only momentarily.  He jumped back up and continued running, taking off an outer shirt as he ran and leaving only a white muscle shirt, which he wore underneath.

At some point during the chase, Officer Kelly observed Mingo sit down behind a bush, where Mingo took off his pants and his shoes.  Mingo then kicked out two boards of a fence and crawled through the opening, allowing him access to a connecting residential backyard.

Although Officer Kelley followed, he was unable to locate Mingo in the backyard.  While looking for Mingo, Officer Kelley walked around the house and

saw Sergeant Armand Campbell and Officer Henry Bufkin pulling up to the residence in another patrol car.  Officer Kelley explained to the two other officers that Mingo had continued to run and described the direction in which he had headed.  Officer Kelley also indicated to the other officers that he needed to return to the scene of the initial traffic stop so that he could secure his patrol car and deal with the passenger in Mingo's car.

As Officer Kelley chased Mingo, Lee, who was still sitting in Mingo's car, called Mingo's mother to inform her that her son had been pulled over and was running from the police.  Ms. Mingo asked to speak to the officer on the scene, who she believed was Officer Kelley.  According to Ms. Mingo, she told Officer Kelley that her son was "very paranoid" and would be afraid of the police.  She also asked the officer to take her son to the hospital if they found him.  The conversation was brief.  Ms. Mingo then called a 911 operator and told her that her son had been stopped, that he was a patient at Mobile Mental Health, that he had been very paranoid lately, and that she wanted to make sure that nothing happened to him.

Back at the scene of the chase, after speaking with Officer Kelley, Sergeant Campbell and Officer Bufkin parked their patrol car and followed the path that Mingo took so that they could attempt to apprehend him.  At a nearby residence, the officers noticed that a flower pot had been knocked over in front of a shed

located at the rear of the property.  They also saw clothing on the ground and what appeared to be a blood smear near the door of the shed.

In the meantime, Officer Daryl Law also responded to the area.  As Officer Law approached the home where Sergeant Campbell and Officer Bufkin were, the resident stepped out of her home and told Officer Law that she heard something in the shed behind her house.  Officer Law approached the shed and met up with Officer Bufkin and Sergeant Campbell.

Once at the shed, the officers announced their presence and ordered Mingo to come out.  Although the officers heard movement from inside the shed, Mingo did not comply.  Upon using a flashlight to peer inside the shed, the officers saw Mingo hiding beneath a weight bench.  Near Mingo were a rack of dumbbells, as well as hatchets, shovels, and various other yard tools.  Officer Law again directed Mingo to come out, but Mingo did not comply.  So Officers Law and Bufkin entered the shed and pulled Mingo out from under the weight bench.  Mingo began resisting and fighting with the officers, and Officer Bufkin described the attempt to restrain Mingo as "trying to hold a greased pig."  Although the officers were ultimately able to put Mingo into a prone position on the floor of the shed, Mingo refused to give the officers his hands.

After a considerable struggle, the officers were finally able to get one of Mingo's hands behind his back and place a handcuff on it.  The officers were not

able to secure Mingo's other hand, despite Sergeant Campbell's repeated commands for Mingo to give them his hand.  According to the officers, Mingo continued to push off with his free hand and then drop down and roll on top of it. Finally, Mingo complied and gave the officers his free hand, which the officers handcuffed behind Mingo's back.

Although the officers eventually were able to apply both handcuffs, Mingo continued to struggle and roll around on the floor of the shed near the yard tools and dumbbells.  Consequently, Officer Bufkin attempted to place his leg across the back of Mingo's legs to keep Mingo still.  Mingo, however, continued to kick and struggle, and began banging his head on the ground multiple times.  In order to keep Mingo from injuring himself, Officer Bufkin tried to hold Mingo's head still. Officer Bufkin later picked Mingo up by his shoulders and arms in an attempt to escort Mingo out of the shed, but Mingo began kicking the officer in his shins and knees, while trying to lunge forward.  Ultimately, Mingo broke free and began running into the yard where other yard tools were present.  When the officers again attempted to escort him, Mingo kept alternatively dropping to the ground or standing up and trying to run away.

At this point, additional officers arrived to assist in the attempts to restrain Mingo.  According to Officer Hugh Barnes, who arrived at the scene and witnessed the other officers struggling with Mingo, Mingo was on the ground violently

flailing, kicking, and rolling in the dirt.  Because Mingo continued to kick and flail, the officers determined that they would apply a four-point restraint to Mingo for his own safety and for the safety of those around him.  The officers obtained leg shackles and rolled Mingo onto his stomach.  Officer Barnes held Mingo by the shoulder and another officer, Chad Anthony, attempted to hold Mingo's legs. Although the officers were able to place the shackles on one of Mingo's legs, Mingo then grabbed ahold of one of Officer Anthony's fingers and refused to let go.  In response, Anthony struck Mingo's arm with his fist to get Mingo to release his grip.  Mingo still would not let go.

Officer Barnes unholstered his Taser and advised that he planned on deploying the Taser if Mingo failed to release Officer Anthony's finger.  Officer Barnes then applied his Taser in "drive-stun" mode to Mingo's back for one, five-second cycle,[1] resulting in Mingo's release of Officer Anthony's finger.  The officers then continued to apply the four-point restraint and carried Mingo to Officer Anthony's patrol car.  At this point, one of the officers present called the paramedics to obtain medical assistance for Mingo.

Once at the patrol car, Officer Anthony and another officer, Zack Davis, placed Mingo in the back seat on his side facing towards the rear of the vehicle. The officers then flipped Mingo over so that he was on his side facing the partition

---

[1] "Drive-stun" mode means that the Taser was used like a stun gun—the Taser is pressed directly against the skin and produces a burning sensation.

between the front seat and back seat of the patrol car.  Despite being restrained in the back seat, Mingo continued to move around and wiggle his body, while making noises.

Lieutenant Travis Dannelley responded to the scene after hearing that Mingo was in custody.  Upon Lieutenant Dannelley's arrival, Mingo was already in the back seat of the car, where he lay on his side.  According to Lieutenant Dannelley, Mingo had a fixed stare and was licking his lips, and the outside of his mouth was white.  Lieutenant Dannelly also noted that Mingo would not respond to his questions and was "flexing" against the restraints.  Lieutenant Dannelley directed Officers Davis and Anthony to stand by the patrol car and monitor Mingo so that he remained on his side.

Officer Davis positioned himself by the open back-seat door on the driver's side, monitoring Mingo while he was in the back of the patrol car.  Mingo continued to move, sometimes rolling onto his stomach.  When this happened, Officer Davis would move Mingo back onto his side, although some testimony suggests that at some point, the officers allowed Mingo to remain on his stomach. Officers estimate that Mingo had been in the back of the patrol car for approximately ten to fifteen minutes when an ambulance arrived.  Officer Davis believes that Mingo lost consciousness as the ambulance arrived at the scene.

When he realized that Mingo had lost consciousness, Officer Davis yelled for Lieutenant Dannelley and the paramedics to come over and attend to Mingo. Officers pulled Mingo out of the patrol car, placing him face down on the ground so that they could release Mingo from the four-point restraint. The ambulance then transported Mingo to the hospital. Mingo never regained consciousness, and on January 28, 2010, he died.

## B.

The State Medical Examiner, F. John Krolikowski, conducted an autopsy on Mingo and determined that the cause of death was "excited delirium." Dr. Krolikowski also noted in his report that Mingo suffered from paranoid schizophrenia and that the toxicology report indicated that cannabinoids and midazolam were present in Mingo's system.

Plaintiff's expert, Dr. James Lauridson, a forensic pathologist, later performed a second autopsy on Mingo. After performing a second autopsy and reviewing Mingo's medical records, Dr. Lauridson determined that Mingo suffered cardiopulmonary arrest and irreversible ischemic brain injury. Dr. Lauridson concluded that Mingo did not have excited delirium and that he did not die of positional asphyxia.[2] Rather, Dr. Lauridson opined that the immediate cause of Mingo's death was cardiomegaly and single-vessel coronary disease, with

---

[2] "Positional asphyxia" is a form of asphyxia that occurs when an individual's body position prevents him or her from obtaining sufficient oxygen.

contributory causes of death listed as "restraint" and "schizophrenia."  Although Dr. Lauridson believed that the restraint used by police officers contributed to Mingo's death, he could not quantify the role that the restraint played in the death. He also conceded that it was possible that someone in Mingo's condition could have died of cardiac arrhythmia during his encounter with the police even if they had not restrained him.  Despite this concession, however, Dr. Lauridson opined that the stress of the incident with the police caused a reaction in Mingo's body that resulted in cardiac arrhythmia.

Plaintiff also offered the expert opinion of Ralph Long, a former police officer with approximately twenty-five years of experience.  Long did not have any criticisms of the City's policies and procedures on the use of four-point restraints and the identification and treatment of the mentally ill that were in place at the time of the incident, and Long stated that he did not believe that the policies and procedures were unconstitutional.  Similarly, Long did not offer any criticisms of how the officers handled the initial traffic stop, chased Mingo, and detained him in the shed.  Long did not find fault with any of the actions of the officers until they placed Mingo in the four-point restraint, which, in conflict with Plaintiff's other expert, Dr. Lauridson, Long, who was not a physician, opined had resulted in positional asphyxia.  Also contrary to Dr. Lauridson's view that excited delirium was not present, Long criticized the officers for not recognizing the signs of

excited delirium. Long opined that if they had been trained properly, the officers would have recognized that Mingo was exhibiting symptoms of mental illness or excited delirium and would not have placed Mingo in the four-point restraint.

## C.

Officers employed by the City of Mobile receive training on a variety of topics both at the police academy and during their tenure as sworn police officers. As is relevant to this matter, the City's Deputy Chief, James Barber, testified that basic training at the police academy addresses the handling of the mentally ill by police officers.

Additionally, the City's orders and policies are provided to officers online. After an officer receives and reviews a particular policy, the officer must acknowledge receipt of the policy by signing for it online.

Various officers involved in this matter acknowledged during their depositions that they received training on the policies relating to use of a four-point restraint and handling of the mentally ill and that they had been instructed on handling the mentally ill when they attended the police academy. For instance, Officer Davis testified that he reviewed the City's policy on mental illness and was taught what symptoms to look for to determine if an individual is mentally ill. He further stated that he had attended a class called "Handling the Mentally Ill" and that he had gone to annual in-service training on the same subject. Deputy Chief

Barber also indicated that all officers receive in-service training on the City's policies.

## II.

Following the death of her son, Ms. Mingo filed an action against the City of Mobile in the Circuit Court of Mobile County, Alabama, alleging claims pursuant to 42 U.S.C. § 1983 for excessive force, unconstitutional policy and practice, and failure to train.  Ms. Mingo also brought state-law claims against the City for wrongful death and negligent supervision, hiring, and retention.  The City removed the action to the United States District Court for the Southern District of Alabama.

After the City moved for summary judgment, the district court granted the motion with respect to the federal-law claims, finding that the plaintiff offered no evidence of any policy or custom that caused Mingo's death.  The district court declined to exercise supplemental jurisdiction over the state-law claims and remanded them to state court.  Ms. Mingo now appeals, contending that the district court erred in granting summary judgment in favor of the City because issues of fact remain with respect to whether the City failed to train its officers to deal with the mentally ill and to use the four-point restraint appropriately.  She does not contend that the four-point restraint resulted in positional asphyxia, but rather, that it caused undue stress that resulted in Mingo's death.  Ms. Mingo also claims that

the district court erred when it denied a motion to compel the City's internal-affairs file relating to the death of her son.  For the reasons set forth below, we affirm.

## III.

We review *de novo* the district court's grant of summary judgment. *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008).  Summary judgment should be entered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to Ms. Mingo, the non-moving party.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam) (citation omitted); *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004)).

## IV.

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a cause of action against any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, [who] subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . . ."  To prevail on a claim for relief under § 1983, a plaintiff must establish that (1) he has been deprived of a right, privilege, or immunity secured by the

Constitution, and (2) he was so deprived under the auspices of governmental authority. *See Griffin v. City of Opa Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

The Supreme Court has held that municipalities may be liable for violations of § 1983, but this liability is limited. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-92, 98 S. Ct. 2018, 2035-36 (1978). Municipalities may be sued for only their own unconstitutional or illegal policies; they may not be sued for the acts of their employees. *Id.* at 691, 98 S. Ct. at 2036. As a result, a claim against a city under § 1983 must be predicated upon an injury inflicted by a municipal policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 2910 (1989).

The existence of a policy or custom sufficient to impose § 1983 liability on a municipal government can be established in several ways. For example, official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Connick v. Thompson*, __U.S.__, __, 131 S. Ct. 1350, 1359 (2011).

A plaintiff can also demonstrate official policy by showing a government policy of inadequate training or supervision. *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami*, 637 F.3d 1178 (11th Cir. 2011); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427 (1985). "A plaintiff seeking to

establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382 (1997) (citing *City of Canton*, 489 U.S. at 388); *AFL-CIO*, 637 F.3d at 1187 (citations omitted).

To establish that a city was "deliberately indifferent," a plaintiff must demonstrate that the municipality knew of the need to train in a particular area and that it made a deliberate choice not to take any action. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation. *Connick*, 131 S. Ct. at 1360; *Gold*, 151 F.3d at 1350-52.

Here, Ms. Mingo's argument rests on the second premise. She contends that the need for training on the use of the four-point restraint and the identification of mentally ill individuals is "so obvious" that it requires training by the City. In support of her position, Ms. Mingo argues that the City knew of the dangers of the use of four-point restraints, particularly to the mentally ill, as demonstrated by the fact that it promulgated specific policies to prevent these risks. But, Ms. Mingo

alleges, the City failed to follow its own policies, and, as a result, her son died in the City's custody.  Ms. Mingo further asserts that she raised genuine issues of material fact concerning this issue, so the district court should not have granted summary judgment in favor of the City.  We respectfully disagree and conclude that the district court correctly granted summary judgment in favor of the City with respect to the § 1983 claims.

## A.

Ms. Mingo points to two directives in support of her argument that the City has a custom or policy that shows deliberate indifference:  MO-2005-88 and General Order 70.  General Order 70 is entitled "Prisoner Transportation," and MO-2005-88 is called "Recognizing and Handling Persons with Mental Illness." The stated purpose of MO-2005-88 is to "enhance officers' ability to recognize, understand and deal with a person with mental illness." According to Ms. Mingo, Section III of MO-2005-88 is particularly important to this case because it identifies symptoms of individuals in an excited state, of which an officer should be aware.  These symptoms include bizarre behavior, shouting, and undressing in public.  MO-2005-88 further explains that individuals suffering from mental illness or drug-induced agitated delirium, as sometimes evidenced by these behaviors, "present an unusual high risk of sudden in-custody death."  Finally, the policy lists guidelines to aid in preventing in-custody deaths, including transporting the subject

in a seated position or on his side, monitoring the person closely, and using a four-point restraint as only a last resort to officer safety.

Ms. Mingo's expert, Long, acknowledged that the City's policies, including MO 2005-88 and GO #77, are constitutional.  Accordingly, Ms. Mingo does not challenge the constitutionality of the City's policies.  Nor, in this matter, is any "widespread pattern" of similar conduct present, and Ms. Mingo does not suggest that any such pattern exists.  Rather, she asserts that liability attaches to the City because the existence of the City's policies demonstrate that the City recognized the "obvious" need for training, yet it failed in sufficiently training its officers.

The Supreme Court has cautioned that the exception creating municipal liability under § 1983 for failure to train applies in only a very narrow range of circumstances, *Brown*, 520 U.S. at 398, and a municipality's culpability "is at its most tenuous where a claim turns on failure to train." *Connick*, 131 S. Ct. at 1359. Indeed, the Supreme Court has provided only a single hypothetical example in *dicta*, recognizing an obvious need for training in the use of deadly force where firearms are provided to police officers. *See City of Canton*, 489 U.S. at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so

17

obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.").

Moreover, in this case, the record contains evidence that the City did train its officers in the use of the four-point restraint and in handling the mentally ill.  In similar circumstances, we have previously held that a city provided its officers with constitutionally adequate training in the use of four-point restraints, so the city was not liable under § 1983 for a failure to train its officers where its officers' use of a four-point restraint resulted in the death of the person restrained.

In *Lewis v. City of West Palm Beach*, 561 F.3d 1288 (11th Cir. 2009), we addressed whether a city was liable for its alleged failure to train officers in the use of hobble restraints (four-point restraints).  In that case, officers encountered Donald Lewis, a disoriented individual who appeared to be under the influence of drugs.  *Id.* at 1290.  When Lewis refused to comply with officers' commands, the officers attempted to restrain him.  *Id.*  After a considerable struggle, the officers used a hobble cord[3] to place Lewis in a four-point restraint.  *Id*.  After Lewis was restrained, he became unconscious and, although the officers performed CPR, Lewis was later pronounced dead.  *Id.*

Lewis's estate brought suit against the City of West Palm Beach under § 1983, alleging a failure to train its officers in the use and application of the

---

[3] A hobble cord is a strap with a loop on one end and a metal hook at the other that is used to limit movement by connecting the ankle restraint to the handcuffs.

hobbles.  *Id.* at 1292.  As in Mingo's case, we noted that the plaintiff's argument rested not on evidence of prior events but on the premise that the need for training on the proper use of hobble restraints during the restraint process is "so obvious" that it requires training to ensure avoiding a constitutional violation.  *Id.* at 1293. After consideration, we concluded that "the use of a hobble does not rise to the level of obviousness reserved for 'a narrow range of circumstances [where] a violation of federal rights may be a highly predictable consequence' of a failure to provide adequate training."  *Id.* (citing *Brown*, 520 U.S. at 409).  We acknowledged the Supreme Court's extreme example in *City of Canton*, stating, "[H]obbles do not have the same potential flagrant risk of constitutional violations as the use of deadly firearms.  Failure to provide training on hobbles is not a 'particular glaring omission in a training regimen.'"  *Id.*  (citation omitted).  Based on these facts, we determined that the City of West Palm Beach was unlikely to be on notice of the need for training in this regard since the use of the four-point restraint under the circumstances did not violate the Fourth Amendment.  *Id.* (citing *Garrett v. Athens-Clarke Cnty.*, 378 F.3d 1274, 1280 (11th Cir. 2004) (per curium)).

Although we made this observation, we ultimately held that West Palm Beach was not liable under § 1983 because the record contained evidence showing that West Palm Beach actually did provide adequate training on the use of the four-

point restraint.  *Id.* at 1293-94.  In reaching this conclusion, we explained that in resolving the issue of the City's liability where a city has a training program, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform, and not merely on the training deficiencies for a particular officer."  *Id.* at 1293 (citing *City of Canton*, 489 U.S. at 390) (internal quotation marks omitted).  It will not "suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."  *City of Canton*, 489 U.S. at 390.  This is so because even adequately trained officers will sometimes make mistakes, and the fact that they do so does not necessarily indicate that the training program is inadequate.  *Id.*

Like the record in *Lewis*, the record in this case contains evidence that the City of Mobile provides its officers with constitutionally adequate training in the use of the four-point restraint and the treatment of the mentally ill.[4]  Indeed, Ms. Mingo does not challenge the training policies themselves.  Instead, she contends that the City does not actually train its officers in accordance with its policies on four-point restraints and identification and treatment of the mentally ill.  In particular, Ms. Mingo asserts that Deputy Chief James Barber "acknowledged . . .

---

[4] We do not find, or even mean to imply, that the use of a four-point restraint in these circumstances was a constitutional violation.  Instead, we simply do not address that question because the City's training program was constitutionally adequate, regardless.

that no actual 'training' occurred in the methods [set forth in the City's policies and that] [t]here was no training or supervision to ensure that officers understood the procedures or could execute them properly, if at all.  In essence, the officers were left to figure out when and how those policies and methods would apply."

The record does not support Ms. Mingo's contentions.  Deputy Chief Barber testified that officers are instructed on "dealing with the emotionally disturbed and mentally ill" at the police academy, and he said that he did not know whether officers were tested in the classes they took, although they were not tested on the policies that they received and signed for as having read and understood.  But Officer Davis testified that he took a class called "Handling the Mentally Ill" while at the police academy, on which he was tested.  In particular, Officer Davis described being taught about the "different symptoms . . . or how [the mentally ill] might act."  In other words, he was taught the content of the City's policy on the mentally ill.  Officer Davis further stated that another class on the subject is offered annually as part of in-service training and that he has taken approximately three classes altogether on the subject.  And Officer Law testified that while he was at the police academy, he was instructed on the use of the four-point restraint.  Ms. Mingo has pointed to no evidence that conflicts with this testimony, so we cannot find that a material issue of fact exists regarding whether the City actually trains its

officers in the use of the four-point restraint and the identification and treatment of the mentally ill.

Because the City did not maintain a deliberate indifference to a potential constitutional violation and because the City provides training on the use of a four-point restraint and the identification of the mentally ill—training pursuant to policies that Ms. Mingo concedes are constitutional—the City cannot be held liable under § 1983.  *See Lewis*, 561 F.3d at 1294 (finding no § 1983 liability where city provided training).  We therefore find that the district court did not err in granting summary judgment in favor of the City with respect to the § 1983 failure-to-train claims.

## VI.

Embedded in Ms. Mingo's brief is her contention that the district court erred when it denied her motion to compel the production of City's internal-affairs file with respect to the incident involving Daniel Mingo.[5]  We do not consider the correctness of the district court's ruling because Ms. Mingo requested only the

---

[5] After reviewing Ms. Mingo's motion to compel and the City's response, the district court directed the City to file a privilege log and to provide the court with all relevant documents so that it could conduct an *in camera* review of the internal-affairs file.  Upon completion of its *in camera* review, the district court denied the motion to compel, noting that the City had already produced a significant portion of the materials that were contained in the internal-affairs file.  In denying the motion to compel, the district court also observed that the only item listed on the privilege log that Ms. Mingo addressed in her motion to compel was information regarding the EMT who was present during the incident.  The City, however, provided Ms. Mingo with records from the ambulance service and, the district court noted that counsel deposed the EMT who treated Mingo on the scene.

contents of the internal-affairs file relating to her son's death.  Nothing in these files could change the conclusion that, under binding precedent, as a matter of law, the City of Mobile provided constitutionally sufficient training for its officers in the use of the four-point restraint and the handling of the mentally ill.

## VII.

Because the facts, viewed in the light most favorable to Ms. Mingo, demonstrate that the City was not deliberately indifferent to the rights of Daniel Mingo, the district court did not err when it granted summary judgment in favor of the City of Mobile.  For this reason, the district court's order is **AFFIRMED**.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 18, 2014

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  13-15828-AA
Case Style:  Cynthia Mingo v. City of Mobile, Alabama
District Court Docket No:  1:12-cv-00056-KD-B

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call David L. Thomas, AA at .

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs